IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CAE INC.,                                    )
                                             )
               Plaintiff,                    )
                                             )
       v.                                    )   C.A. No.
                                             )
GULFSTREAM AEROSPACE                         )   DEMAND FOR JURY TRIAL
CORPORATION and FLIGHTSAFETY                 )
INTERNATIONAL, INC.,                         )
                                             )
               Defendants.                   )

## COMPLAINT

Plaintiff CAE Inc. ("CAE") brings this action for damages and injunctive relief against

Gulfstream Aerospace Corporation ("Gulfstream") and FlightSafety International Inc. ("FSI"),

and alleges on knowledge as to itself and its own acts and on information and belief as to all

other matters as follows:

## NATURE OF THE ACTION

1.      This lawsuit challenges the unlawful actions undertaken, either independently or

pursuant to a conspiracy, by defendants Gulfstream and FSI to insulate themselves against

competition, including by plaintiff CAE, to provide business aviation training for pilots of

Gulfstream's latest, fastest, and most expensive model of business aircraft, the G650, and its

variants, like the G650ER.

2.      Gulfstream is an original equipment manufacturer ("OEM") of business (or

corporate) aircraft.  CAE and FSI are two of the world's leading developers and suppliers of

flight simulators, and the two leading business aviation training ("BAT") providers.  BAT is the

training that aviation regulatory authorities, such as the U.S. Federal Aviation Administration

("FAA"), require all pilots to receive in order to become qualified and licensed to fly any model

of business aircraft.  CAE and FSI deliver BAT to thousands of pilots every year at training centers they operate in the United States and around the world.

3.     Until the events leading up to this lawsuit, CAE and FSI have been able to compete against one another to develop and deploy flight simulators and BAT services for OEMs' (including Gulfstream's) various models of business aircraft—and they have routinely done so.  This competition occurred on a model-by-model basis because technological differences and regulatory requirements prevent flight simulators and BAT programs designed and approved for one model of business aircraft from being substituted for those designed and approved for another model.

4.     With respect to the G650, Gulfstream and FSI have grounded this competition before it could take off.  Gulfstream and FSI, by agreement or independently, have purposefully undertaken a series of unlawful and unjustified actions designed to exclude CAE from the market for G650 BAT services in the United States and elsewhere, and thereby to enrich themselves at the expense of G650 BAT customers and CAE.

5.     More specifically, Gulfstream and FSI entered into a no-bid, exclusive dealing contract, or contracts, to suppress CAE's development and deployment of competing G650 (as well as G280) flight simulators and BAT services until at least December 2020.  This contract designates FSI as Gulfstream's exclusive "authorized" G650 BAT provider.  It also bars Gulfstream, absolutely, from licensing or selling to a competing BAT provider (e.g., CAE) any data, parts, and equipment ("DP&E") intended for use in a G650 flight simulator, other G650 training devices, or a G650 BAT program to be deployed anywhere, at any time, before December 2020; the same is true for Gulfstream's G280 business aircraft.  In exchange for this exclusivity, FSI agreed, on information and belief, to pay Gulfstream a portion of the resulting

monopoly profits earned on its sales of G650 (and G280) BAT services.  As a result of this agreement, Gulfstream has refused to license to CAE any of its DP&E for the G650.

6.     To buttress the effects of this exclusive dealing agreement, Gulfstream, either pursuant to a conspiracy with FSI or independently, has undertaken additional, unjustified actions for no purpose other than to thwart CAE's efforts to develop and deploy competitive G650 flight simulators and BAT programs even without the aid of Gulfstream's DP&E:

a.     Gulfstream has coerced independent suppliers of software systems and equipment needed by CAE to build its G650 flight simulators and to offer G650 BAT programs (e.g., Honeywell) to agree not to sell or license those suppliers' (not Gulfstream's) proprietary products to CAE without Gulfstream's consent.  To date, Gulfstream has refused, without explanation, to provide that consent, and given every indication it never will.

b.     Gulfstream has raised unfounded concerns about the safety of any CAE-built G650 flight simulators or BAT programs despite knowing that both CAE and FSI have, even without DP&E licenses from OEMs, developed and received regulatory approval for flight simulators and BAT programs for aircraft comparable to the G650.

7.     Defendants' actions, together and independently, have substantially increased CAE's costs to develop its G650 flight simulators and G650 BAT programs.  They also have delayed substantially the deployment of CAE's first G650 flight simulator and BAT program, and threaten to delay substantially, if not indefinitely, CAE's deployment of additional G650 flight simulators and BAT programs, in the United States and elsewhere, to compete with FSI. By foreclosing that competition, defendants have been (and will continue to be) able to charge customers in the United States and elsewhere substantially higher prices for G650 BAT services

than they could have charged in a competitive market, and to share in the resulting unlawful, monopoly profits.

8.      By delaying CAE's entry into the G650 BAT market, defendants have also caused CAE to lose millions of dollars of profits, including from lost sales of G650 BAT services that CAE would have earned in the absence of defendants' unlawful conduct.

9.      CAE seeks damages for the injuries it has suffered, and will continue to suffer, as a result of defendants' conduct, as well as an injunction barring defendants from continuing their anticompetitive scheme and unlawful interference with CAE's ongoing and future business relationships.

## JURISDICTION, VENUE & INTERSTATE COMMERCE

10.      The Court has subject matter jurisdiction over CAE's antitrust claims under 28 U.S.C. §§ 1331 and 1337.  Those claims seek damages and injunctive relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) & 26, for defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

11.      The Court has diversity and supplemental jurisdiction over CAE's claims under Delaware common law for tortious interference based on 28 U.S.C. §§ 1332 and 1367.  As alleged above and elsewhere in the Complaint, there is complete diversity of citizenship among the plaintiff and defendants, and the amount in controversy, excluding interest and costs, in this lawsuit exceeds $75,000.00.

12.      Venue is proper in this judicial district pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 & 22, and 28 U.S.C. § 1391, because defendants are found, have agents, and transact business within this district.

13.     During the time periods relevant to the allegations in this Complaint, as further alleged below, defendants engaged in business that is within and substantially affects the flow of interstate or foreign commerce.  Defendants, among other things, negotiated agreements with, and sold and shipped business aircraft, flight simulators, and BAT services to, customers located throughout the United States, including in Delaware, and elsewhere around the world.

## PARTIES

14.     Plaintiff CAE is a Canadian corporation headquartered in Saint Laurent, Quebec, Canada.  CAE is one of the world's leading suppliers of civil flight simulators, having sold simulators and flight training devices to most of the world's major airlines, aircraft manufacturers, and training center operators.  CAE has simulated almost every modern airliner for both major and regional carriers, as well as many of today's business jets and helicopters, and recently has developed, or is currently under contract to develop for deployment, the first simulators for many of the world's newest aircraft platforms.

15.     CAE has a broad network of civil (including commercial and business aircraft) training facilities, with more than 250 full-flight simulators in 50 civil training locations worldwide (including eight locations in the United States).  CAE has teamed with airlines and OEMs to improve services and offer training solutions for every segment on the aviation industry.

16.     CAE offers BAT services, a subset of civil aviation training, for various models of OEMs' business aircraft, including Gulfstream, Bombardier, Cessna, Dassault, Embraer, Hawker, and Beechcraft, at training centers in North and South America, Europe, the Middle East, and Asia.

17.     In the United States, CAE offers BAT services at its training centers in Morristown, New Jersey, and Dallas, Texas.   CAE currently offers BAT services for

Gulfstream's G200, G300, G350, G450, G550, and GIV model aircraft in Morristown, and for Gulfstream's G400, G450, G550, GIII, GIV, and GV model aircraft in Dallas.

18.     Defendant Gulfstream is a Delaware corporation, headquartered in Savannah, Georgia, and registered to do business in Delaware.  Gulfstream is one of the leading manufacturers of business aircraft, including the Gulfstream G650.  Gulfstream engineers, manufactures, and services its business aircraft at facilities located across the United States and around the world.  Gulfstream employs sales and service representatives who have responsibility for customers in Delaware; negotiates with and sells business aircraft to customers in Delaware; and deploys employees to provide technical and advisory services to FSI and FSI's BAT customers at FSI's training facility in Wilmington, Delaware.

19.     Defendant FSI is a New York corporation, headquartered at New York's LaGuardia Airport, and registered to do business in Delaware.  FSI is one of the leading designers and manufacturers of flight simulators in the world.  FSI offers BAT services at its training centers in North America and Europe for various models of OEMs' business aircraft, including Gulfstream, Bombardier, Cessna, Dassault, Embraer, Hawker, and Beechcraft.

20.     FSI offers BAT services on Gulfstream aircraft at its training centers in Dallas, Texas; Columbus, Ohio; London Farnborough, United Kingdom; Wilmington, Delaware; Long Beach, California; and Savannah, Georgia.  It currently offers BAT services on Gulfstream's G650 at its Savannah and Long Beach training centers, and has announced that it will install its fourth G650 simulator in early 2016 at its training center in Wilmington.

**FACTUAL BACKGROUND**

**A.     Business Aviation Aircraft, OEMs, and the Gulfstream G650**

21.     Aircraft OEMs design, build, and service aircraft.  OEMs tend to specialize in either commercial aircraft, which are large passenger jets produced by OEMs like Boeing and Airbus, or business aircraft, which are smaller passenger jets produced by OEMs like Gulfstream.

22.     Gulfstream is one of the roughly half-dozen business aircraft OEMs in the world that design and manufacture the overwhelming majority of all business aircraft.  With nearly $7 billion in revenues in 2014, Gulfstream is projected to account for more than 30 percent of all business aircraft sales (by value) in the United States and worldwide between 2015 and 2019. Entry by new business aircraft manufacturers into this market in the foreseeable future is unlikely due to the high barriers to doing so, including the required substantial capital investments in design, manufacturing, and service capacity and facilities; the need for technical engineering expertise; the highly regulated nature of the aerospace industry; and the image, branding, and reputation accumulated over decades by the existing business aircraft OEMs.

23.     On March 13, 2008, Gulfstream announced it was developing the Gulfstream G650, its largest, fastest, and most expensive business jet.  With an anticipated $60 million list price, $10 million more than its predecessor, Gulfstream's then-president, Joe Lombardo, was quoted as saying, "The G650 is in a brand new market by itself."

24.     Gulfstream delivered the G650 to its first customer on December 12, 2012.  At the time, there reportedly was a three-year waiting list.  Today, a fully fitted out Gulfstream G650 reportedly costs more than $66 million.

**B.      Business Aircraft Flight Simulators and Business Aircraft Training Services**

25.     Flight simulators are sophisticated, computer-driven devices used to train aircraft pilots.  They replicate both the cockpit interior and controls of a particular model of aircraft and the performance of that aircraft during all operations and under all conditions within the flight envelope.  Construction of a flight simulator requires access to, among other things, a complete set of flight test data reporting the aircraft's performance under those conditions; software and hardware components that mimic the instrumentation and operations of the aircraft; and physical components to model the cockpit.  Costs to develop a flight simulator for a prototype aircraft can reach $30 million.

26.     Flight simulators designed for one model of aircraft generally cannot be used to train pilots for another model of aircraft, even if the two aircraft are manufactured by the same OEM.  For example, a Gulfstream G550 simulator cannot be used to train and qualify a pilot to fly a Gulfstream G650.  This is true for at least two reasons.  First, different models of business aircraft use different technologies (e.g., instruments, avionics, and cockpit layouts); they also differ in size and design, which leads different models to perform differently.  As a result, flight simulators must be specifically designed for each model of aircraft in order to accurately replicate the handling and system characteristics of a particular aircraft.

27.     Second, for these same reasons, FAA regulations (and those of its counterpart agencies in other jurisdictions) require that flight simulators replicate the specific model of aircraft for which they are used to provide business aviation training.  Training on a flight simulator that does not replicate the model of aircraft for which a pilot is seeking certification will not support the qualification of the pilot on that model aircraft.

28.     Customers for BAT services include business aircraft operators, such as airlines, corporations, and owner-operators.  Business aircraft operators may own a single aircraft or a fleet of aircraft, ranging from as few as two to more than 100 aircraft.  Some operators purchase only one make or model of business aircraft; others purchase more than one make or model.

29.     Business aircraft operators generally do not own flight simulators or conduct their own training operations.  Rather, they outsource the training of their pilots primarily to CAE and FSI.  They also generally tend to purchase BAT services in the geographic regions where they are located (e.g., North America, Europe, Middle East, or Asia).

30.     Operators who own multiple makes or models of business aircraft often prefer to purchase BAT services from a single provider.  Such one-stop shopping benefits operators by providing a single point of contact for scheduling, billing, and invoicing and by ensuring a consistent level of quality as well as economies of scale based on their larger purchase volumes.

## C.     BAT Flight Simulator and Training Competition

31.     CAE and FSI are the leading developers and providers of business aircraft flight simulators and BAT services in the world.  CAE and FSI account for nearly 90 percent (approximately 25 and 63 percent, respectively) of all flight simulators deployed worldwide for all makes and models of business aircraft, and nearly 90 percent (approximately 27 and 62 percent, respectively) of all BAT services sold worldwide.

32.     Entry by new BAT service providers in the United States and elsewhere is exceedingly difficult and therefore unlikely in the foreseeable future due to high barriers to entry. These barriers include, among other things, the substantial capital investments and technical expertise required to develop and manufacture flight simulators and to develop, deploy, and support BAT programs; the need to develop, deploy, staff, and maintain a network of training

facilities; the highly regulated nature of the aerospace industry; and the branding and reputation of the existing BAT providers.

33.     Business aircraft OEMs typically do not sell BAT services.  Rather, they tend to license or sell DP&E that are used to build flight simulators or to create BAT programs.

34.     Until recently, CAE and FSI have competed, often head-to-head, to provide BAT services for different models of business aircraft.  Upon its announcement of a new aircraft model, an OEM generally will solicit bids from flight simulator manufacturers, including from CAE and FSI, to become the authorized BAT services provider for the new aircraft.  The winner of the bid then will work with the OEM during the development and testing of the new aircraft. Using DP&E received from the OEM or, if not provided by the OEM, from the OEM's suppliers, the selected simulator manufacturer will design, build, and obtain regulatory approval for flight simulators and BAT programs for the aircraft, to be ready to train pilots when the aircraft enters service and is delivered to customers.

35.     As part of its sale of an aircraft, an OEM will usually include a certain amount of initial training for the customer's pilots and maintenance technicians, which training will be provided by the OEM's authorized BAT provider.  This initial training, when paid by the OEM, is called "entitlement training."  Some customers insist on receiving this entitlement training from their preferred training provider.  It is rare for an OEM to include in the sales price of an aircraft any training beyond the initial training, i.e., the so-called "recurrent training" required to maintain pilots' certification for flying the aircraft.

36.     The company that loses the bid to be the OEM's "authorized" BAT provider, however, does not also lose the opportunity to compete for sales of initial or recurrent training

for the new aircraft.  Both CAE and FSI have developed flight simulators and BAT programs for new aircraft even when they were not selected as an OEM's authorized BAT provider.

37.     Nor does the designation of an authorized BAT provider ordinarily prevent OEMs (including Gulfstream), or third-party vendors, from selling DP&E to a potentially competing BAT provider for those aircraft models.  OEMs routinely license DP&E to more than one BAT provider.  CAE, for example, has entered into licensing agreements with Gulfstream to develop simulators and BAT programs for all nine Gulfstream models for which CAE now offers training (see ¶ 17, supra), even though FSI is the "authorized" provider for all of those models.

38.     Both CAE and FSI also have developed BAT programs for business aircraft without OEM support or data.  CAE, for example, has conducted flight test programs and deployed simulators and BAT courses based on non-OEM licensed DP&E for many different aircraft types, including the Citation X, Hawker 800XP, and Embraer 145.  Even without OEM licensed data, CAE was able to successfully develop and deploy these BAT programs with access to DP&E, such as cockpit parts and avionics software, from third-party vendors.

39.     Flight simulators and BAT programs developed without OEM data and support are no less safe or effective than those developed with OEM data and support.  Both require regulatory approval by the FAA or its counterparts.  None of the simulators or BAT programs developed independently by CAE has been denied approval by the FAA or its foreign counterparts on the basis of quality, fidelity to the aircraft, or safety; all were approved.

40.     Developing flight simulators and BAT programs without data or support from an OEM, however, is substantially more difficult, time-consuming, and expensive than when done with OEM support.  For example, flight simulators rely on flight test data—i.e., electronic records detailing how an aircraft actually performs in the real world under different conditions—

to replicate the performance of the aircraft in the simulator.  With a license for those data, a BAT

provider will receive from the OEM the flight test data generated during the OEM's own testing

of the aircraft.  Without a license, as two senior FSI engineers explained in a 2012 article, the

BAT provider must generate flight test data on its own by conducting a "flight test campaign …

carried out by a third-party contractor or using one's own in-house flight test group."  These

"flight test campaigns" require an unlicensed BAT provider to obtain access to the aircraft, fit it

out with instruments, and retain pilots to conduct multiple test flights of the aircraft.  During

these flights, the instruments gather and record the data that are used to develop the simulator

that replicates the aircraft's performance.

    41.    Not having licensed data also delays deployment of competing flight simulators

and BAT programs, because the development process cannot begin until an aircraft is in service

and available for use to conduct test flights.  This delay provides the authorized BAT provider

with a head start to develop, deploy, and commercialize its "authorized" flight simulators and

BAT program.

    42.    FSI's development and deployment of its Gulfstream G650 flight simulators and

BAT program is a prime example.  On October 21, 2009, FSI announced that Gulfstream had

selected FSI as its "training partner" for the new Gulfstream G650 aircraft.  FSI explained that it

would work "closely" with Gulfstream to develop "comprehensive training programs, flight

simulators and other advanced training devices" for the G650, and that the "start of training

[would] coincide with the entry into service of the aircraft."

    43.    A year later, on October 13, 2010—more than two years before delivery of the

first G650 to a customer—FSI announced that "engineering development and production of the

first Gulfstream G650 aircraft flight simulator ha[d] been completed," and that it was "scheduled to arrive at [FSI's] Learning Center in Savannah, Georgia in December 2010."

44.    FSI announced on May 8, 2012, that its first G650 flight simulator had received regulatory approval by the European Aviation Safety Agency ("EASA") and that review and approval by the FAA were expected before the start of customer training later that year.  FSI also announced that its second simulator would be installed "in a few weeks" in Savannah, and that a third would be added in 2013.  Six weeks before delivery of the G650 to its first customer, on October 29, 2012, FSI confirmed that its G650 training program was underway using both flight simulators in Savannah.

45.    On February 21, 2013, FSI announced that "within another year" it would install the third G650 flight simulator at its learning center in Long Beach, California.  (That third simulator is now in operation.)  And, most recently, on February 6, 2015, FSI announced that it would install a fourth G650 simulator at its learning center in Wilmington, Delaware in early 2016.

**D.    CAE's Efforts to Develop Competing G650 Flight Simulators and BAT**

**1.    CAE's Unsuccessful Efforts to License G650 DP&E from Gulfstream**

46.    In light of anticipated demand for the G650, CAE began in 2011 to plan and prepare to develop and deploy two to three full-flight simulators (and associated lower-end training devices) and BAT programs for the G650, as soon as possible after the G650's anticipated commercial launch.  CAE planned to deploy the first of its simulators at one of its U.S. training facilities.

47.    To that end, in late 2011, CAE asked Gulfstream about the possibility of licensing DP&E for Gulfstream's G650 and G280 aircraft while negotiating a DP&E license for other

Gulfstream aircraft. At the time, Gulfstream agreed to license DP&E for the other aircraft, but not for the G650 or the G280.

48.     By early 2013, just after the first customer delivery of the G650, dozens of existing and prospective G650 BAT customers, in the United States and elsewhere, were encouraging CAE to develop and deploy G650 flight simulators and BAT programs, as CAE had done in the past for other Gulfstream models, to provide a competitive alternative to FSI's "authorized" program.

49.     CAE renewed its inquiry regarding a G650 DP&E license with Gulfstream in April 2013. Gulfstream again declined to license any G650 DP&E to CAE, explaining in June 2013 that it had entered into an agreement with FSI that prohibited Gulfstream from supplying DP&E to anyone else for use in a G650 flight simulator or BAT program that might be deployed before December 2020.

50.     Gulfstream also threatened CAE in these discussions, saying it would "do what it had to do" to actively discourage CAE from building a G650 simulator, including blocking suppliers from selling CAE enabling DP&E. Gulfstream repeated this threat in August 2013, when it called CAE to ask about CAE's reported inquiries to purchase a flight control product from Thales, an independent aerospace supplier. Gulfstream told CAE that it had no objection to CAE purchasing Thales' product, unless CAE intended to use it for a G650 flight simulator. When CAE declined to disclose its confidential business plans, Gulfstream reiterated that it would seek to actively discourage CAE from pursuing a competitive G650 BAT program.

**2.     CAE's Efforts to License and Purchase Avionics DP&E from Honeywell**

51.     Meanwhile, to obtain the avionics software, data, and equipment that CAE required for its G650 project, CAE had turned to its decades-long supplier Honeywell. CAE

previously had licensed and purchased Honeywell's proprietary DP&E to develop simulators for its BAT programs for Gulfstream's GIV, GV, G450, and G550 business aircraft and their variants. For those models, CAE had licensed flight data and manuals from Gulfstream, but procured avionics DP&E from Honeywell. None of the DP&E that CAE procured from Honeywell for those models was subject to any agreement between CAE and Gulfstream, nor on information and belief did Honeywell need Gulfstream's consent to license Honeywell's proprietary DP&E to CAE.

52. Between June 2011, when CAE first told Honeywell that it was planning a G650 BAT program, and January 2015, when CAE learned of Gulfstream's and FSI's interference with its G650 BAT development program, Honeywell never once indicated that it would not be able to provide its own proprietary DP&E to support CAE's G650 flight simulators and BAT program. To the contrary, Honeywell consistently advised CAE that it would license software and data and sell equipment associated with its own proprietary systems to CAE, and entered into agreements with CAE—and accepted and filled purchase orders from CAE—to do so.

53. In 2011, 2013, and early 2014, Honeywell provided CAE with up-to-date lists of the proprietary Honeywell DP&E required for the Gulfstream G650 that CAE requested. In early 2014, Honeywell also provided, in response to CAE's request, price quotes for its proprietary DP&E and related licenses for two G650 flight simulators and an option for a third.

54. Between March and December 2014, Honeywell signed agreements licensing CAE to use Honeywell's proprietary software and data in CAE's first G650 flight simulator and to use for internal development purposes a G650 integrated procedure trainer ("IPT"), a lower-end device that allows a trainee pilot to familiarize herself with all procedures in an aircraft prior

to using a full flight simulator.  Honeywell also accepted all of the purchase orders that CAE submitted for Honeywell proprietary parts for its first flight simulator.

55.     Honeywell delivered—and CAE paid for—all of the avionics software, data and hardware that CAE licensed or purchased from Honeywell in 2014 to design and build CAE's first G650 flight simulator and to support its G650 BAT program.

**E.    Defendants' Interference with CAE's Development of Competitive G650 Flight Simulators and G650 BAT Services**

56.     On January 8, 2015, two weeks after CAE issued a press release announcing its plans to deploy its first G650 flight simulator in early-to-mid-2016, Gulfstream contacted CAE and challenged CAE's ability to lawfully deploy any CAE-built G650 flight simulator.

57.     In their ensuing communications, Gulfstream argued that CAE's G650 flight simulators and BAT program would pose "safety" concerns.  Yet, Gulfstream has no plausible basis to challenge or prevent CAE's deployment of G650 flight simulators or BAT programs on the safety grounds.  Both CAE and FSI have successfully and consistently obtained regulatory approval for and deployed business aircraft simulators and BAT programs without OEM support or licenses.

58.     Gulfstream further claimed—consistent with its threats in mid-2013 to block CAE's access to independent aerospace suppliers (see ¶¶ 49-50, supra)—that it had agreements with those suppliers that barred them from supplying any DP&E to third parties, including CAE, for use in a G650 simulator or G650 BAT program.

59.     To CAE's surprise, Gulfstream told CAE on January 20, 2015, that it had directed Honeywell to obtain CAE's consent to disclose to Gulfstream "a full and complete list, by part number and other detailed identification data, of all items provided to CAE (or agreed to be

provided) in support of or otherwise related to a G650 simulator build and/or G650 training course(s) development."

60.     On the same day, Honeywell confirmed to CAE that Gulfstream indeed had demanded that Honeywell disclose the software, data, and equipment it had licensed or sold (or agreed to license or sell) to CAE, and asked for CAE's consent to do so.  Honeywell confided that Gulfstream would not relent until it had received this information.

61.     The next day, Honeywell asked CAE to sign an agreement consenting to the requested disclosure.  Despite the highly unusual nature of this request, the first of its kind ever received by CAE from a supplier, CAE was compelled to consent to Honeywell's disclosure to Gulfstream of the Honeywell proprietary licenses, software, data, and equipment that CAE had purchased from Honeywell for its G650 project.

62.     On March 3, 2015, Honeywell advised CAE that, despite its previous representations, it would accept no new purchase orders related to CAE's second G650 flight simulator, and that it would cancel all the purchase orders that CAE had submitted for that second training device.

63.     On March 25, 2015, three months after Gulfstream demanded that Honeywell disclose CAE's purchases of Honeywell proprietary DP&E for its G650 project, Honeywell informed CAE that it had signed a new agreement with Gulfstream that required Honeywell to obtain Gulfstream's consent before selling or licensing any of Honeywell's proprietary DP&E for use in a G650 simulator or BAT program.

64.     Honeywell thereafter declined to sell or license any DP&E to CAE for its G650 project without first obtaining Gulfstream's consent, which Gulfstream has uniformly withheld.

65.     Between March 2 and April 15, 2015, CAE submitted to Honeywell purchase orders for DP&E related to its first and second G650 flight simulators.  More specifically, for its first flight simulator, CAE submitted purchase orders for three ancillary training devices (Vsims) for use with its first simulator to support its BAT program.  CAE also submitted a request asking Honeywell to amend the IPT license that CAE had purchased in 2014 (see ¶ 54, supra) to allow CAE to use the IPT for commercial training with its first simulator, an amendment that Honeywell has routinely granted in the past—and would have here, especially considering that Honeywell charged (and CAE paid) the same price for the development license that Honeywell charges for an operating license.  For its second flight simulator, CAE submitted purchase orders for parts as well as for the licenses, software, and data needed to build its second flight simulator and for the ancillary training devices (IPT and Vsims) to use with that simulator to support CAE's G650 BAT program.

66.     In the new few months, Honeywell cancelled all of the purchase orders that CAE submitted for parts for its second flight simulator.

67.     As for all the other purchase orders CAE submitted, Honeywell insisted on seeking Gulfstream's consent, with now predictable results:

        a.      On June 23, 2015, Honeywell informed CAE that Gulfstream had refused to consent to Honeywell's request to amend its license with CAE to allow CAE to use the IPT that CAE previously had purchased from Honeywell for training, instead of laboratory, purposes to support CAE's first G650 flight simulator and BAT program.

        b.      On July 8, 2015, Honeywell informed CAE that Gulfstream had refused to consent to Honeywell's request to license to CAE the software and data for the ancillary training

devices (Vsims) that CAE intended to use to support its first G650 flight simulator and BAT program.

> c.   On July 31, 2015, Honeywell informed CAE that Gulfstream had refused to consent to Honeywell's request to license to CAE the software and data required for CAE's second flight simulator and the ancillary training devices (IPT and Vsims) for use in support of that simulator and CAE's BAT program.

68.   Without the proprietary Honeywell DP&E that CAE requested from Honeywell—the sale and licensing of which Gulfstream has blocked, either independently or pursuant to a conspiracy with FSI—CAE has incurred (and will continue to incur) substantially increased costs to develop and deploy its first G650 flight simulator and G650 BAT program, and its ability to develop and deploy any additional G650 flight simulators or BAT programs will be foreclosed for a substantial period of time, if not indefinitely.

**F.   Relevant Product and Geographic Markets**

69.   The relevant product market affected by defendants' unlawful conduct is the market for G650 BAT services (including its variants).  As explained above, flight simulators and BAT services are unique to each model of business aircraft; they are not functionally interchangeable.  No flight simulator or BAT program designed and approved for one model of business aircraft may be substituted for those designed and approved for another model of business aircraft.  Nor as a result would or could customers seek to substitute a flight simulator or BAT program designed and approved for one model of business aircraft for those designed and approved for another in response to a small but significant and non-transitory price increase of the latter.  Competition for sales of flight simulators and BAT services for each model of business aircraft occurs in a market limited to that model of aircraft.

70.     The relevant geographic market is the United States.  BAT customers tend to purchase BAT services in the geographic regions where they are located, regardless of small but significant and non-transitory differences in prices for the same services in other regions.

**G.     Defendants' Conduct Has Caused Injury and Damage to CAE**

71.     Defendants' actions, independently and in combination, to prevent or delay CAE from developing and deploying G650 flight simulators and G650 BAT services have injured— and, unless enjoined, will continue to injure—CAE in its business and property.

72.     Defendants' conduct has already imposed substantial, unnecessary development costs on CAE.  It has also delayed substantially the deployment of CAE's first G650 flight simulator and BAT program, and threatens to delay substantially, if not indefinitely, CAE's deployment of additional G650 flight simulators and BAT programs, in the United States and elsewhere, to compete with FSI.

73.     Meanwhile, customers for G650 BAT services in the United States and elsewhere have encouraged CAE to develop a competitive G650 BAT program and inquired about purchasing these services as a competitive alternative to FSI's programs.  The delay caused by defendants' conduct has led CAE to lose millions of dollars of profits, including from lost sales of G650 BAT services to these customers who instead purchase G650 BAT services from FSI.

**H.     Defendants' Conduct Has Caused Anticompetitive Effects**

74.     Defendants' conduct has substantially delayed (and will continue to delay) the launch of CAE's G650 flight simulators and BAT programs in the United States and elsewhere, thereby foreclosing all competition in the market for G650 BAT services.  As result, G650 BAT customers have (and will continue to have) only one source (FSI) from which to purchase G650 BAT services.

75.     The prices that FSI has been (and is) charging for those services are supracompetitive, exceeding by 20–30 percent the prices for BAT services for comparable business aircraft (with no increased cost-basis to justify the increased prices).

76.     The introduction of a competing BAT program for a particular make and model of business aircraft ordinarily leads to a reduction in BAT prices for that aircraft.  In the case of the G650, entry by CAE will substantially, if not completely, eliminate the premium FSI presently is charging for G650 BAT services.

77.     Absent a competing G650 BAT program, customers have been (and will continue to be) compelled to pay Gulfstream's and FSI's exorbitant, supracompetitive BAT prices.

78.     No G650 BAT customer chose to pay those supracompetitive prices.  Purchasers of the Gulfstream G650 had no reason to suspect that FSI would be their only option for G650 BAT services.  Gulfstream and FSI never revealed to G650 customers the nature and extent of their exclusive relationship.  Nor did they disclose to G650 customers their actions or conspiracy to ensure that FSI indefinitely would be the only BAT provider for the G650.

79.     To avoid FSI's exorbitant prices now, customers would have to sell their G650s and purchase new business aircraft for which competitively priced training services are available. The inefficiency, inconvenience, and relative costs of doing so make such a switch uneconomical and highly unlikely, thereby ensuring that Gulfstream and FSI will continue to reap the supracompetitive profits achieved through their anticompetitive tactics.

I.     **Defendants Have No Legitimate Business Justification for Their Conduct**

80.     Neither Gulfstream nor FSI has any legitimate business justification for their exclusive agreement or Gulfstream's interference with CAE's relationships with suppliers, including CAE's relationship with Honeywell.

81.     Gulfstream's and FSI's exclusive dealing arrangement is not supported by any reasonable commercial rationale within the business aircraft and training industry.   OEMs routinely license DP&E to more than one training service provider in ways that do not jeopardize BAT consumers' interests like Gulfstream's and FSI's exclusive dealing arrangement and other actions have done.   Gulfstream, for example, has licensed the DP&E for nearly all of its business aircraft to CAE even though FSI is the designated authorized BAT provider for those aircraft. CAE offered to explore such opportunities with Gulfstream for the G650, but Gulfstream has refused based on its agreement with FSI.

82.     Gulfstream has no plausible basis to challenge or prevent CAE's deployment of G650 flight simulators or BAT programs on the grounds of safety.   Both CAE and FSI have successfully and consistently obtained regulatory approval for and deployed business aircraft simulators and BAT programs without OEM support or licenses.

## COUNT 1: EXCLUSIVE DEALING (SHERMAN ACT § 1, 15 U.S.C. § 1)

83.     CAE incorporates by reference as if alleged in this Count the allegations in paragraphs 1 to 82 above.

84.     Defendants' exclusive dealing agreement constitutes an unlawful conspiracy in restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

85.     Defendants' unlawful exclusive agreement prohibits Gulfstream from supplying to any competing BAT provider any DP&E or other material support for use in a G650 flight simulator or G650 BAT program to be deployed before December 2020.   On information and belief, FSI agreed to pay Gulfstream a portion of any monopoly profits earned on sales of G650 BAT services.

86.     Defendants' unlawful exclusive dealing arrangement has substantially delayed and foreclosed all competition—and thereby created, and allowed FSI to exercise, market power—in the relevant market for G650 BAT services in the United States.

87.     Defendants' unlawful exclusive dealing arrangement lacks any procompetitive benefits or legitimate business justification.  Alternatively, none of the purported procompetitive benefits or justifications that defendants might offer in support of their arrangement, either independently or collectively, would outweigh its anticompetitive effects and, in any event, they could be achieved by substantially less restrictive means.

88.     Defendants' unlawful exclusive dealing arrangement has injured competition in the relevant market by depriving G650 BAT services customers of the benefits that timely entry by a competing provider would produce, including reduced prices and improved quality services.

89.     Defendants' unlawful exclusive dealing agreement has injured CAE by causing CAE to lose millions of dollars of profits, including from lost sales of G650 BAT services.

## COUNT 2: TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS (DELAWARE COMMON LAW)

90.     CAE incorporates by reference as if alleged in this Count the allegations in paragraphs 1 to 89 above.

91.     Gulfstream, either independently or pursuant to a conspiracy with FSI, has in violation of Delaware common law intentionally and improperly interfered with CAE's licensing and purchase of DP&E from suppliers, including Honeywell, solely in order to block CAE's development and deployment of G650 flight simulators and G650 BAT programs in competition with FSI.

92.     CAE has a long established supply relationship for DP&E with Honeywell.  CAE made arrangements with Honeywell to license and purchase Honeywell's proprietary DP&E for

the development and deployment of two and possibly three G650 flight simulators and BAT programs.  Honeywell agreed to supply, and in fact did supply, much of the DP&E required by CAE for its first G650 flight simulator; and prior to Gulfstream's interference, Honeywell had indicated its willingness to supply the DP&E that CAE required for additional G650 flight simulators.

93.     At the time of its interference, Gulfstream had knowledge of CAE's supply relationship with Honeywell, as well as CAE's licensing and purchase, and intent to license and purchase, Honeywell's proprietary DP&E to develop and deploy G650 flight simulators and BAT programs.

94.     With no legitimate business justification or purpose, Gulfstream intentionally induced Honeywell to agree not to provide its proprietary DP&E to anyone, including CAE, for the development of a G650 simulator or BAT program without Gulfstream's consent. Gulfstream has since refused to consent to any of CAE's requests to purchase or license Honeywell's proprietary DP&E to support CAE's G650 flight simulators and BAT programs.

95.     Gulfstream's interference, undertaken either independently or pursuant to a conspiracy with FSI, has imposed significant, unnecessary development costs on CAE and delayed substantially the deployment of CAE's first G650 flight simulator and G650 BAT program, and delayed substantially, if not foreclosed indefinitely, CAE's ability to develop and deploy additional G650 flight simulators and G650 BAT programs, in the United States and elsewhere.  It has thereby caused CAE to lose millions of dollars of profits, including from lost sales of G650 BAT services.

## PRAYER FOR RELIEF

Wherefore, CAE prays for:

A.      A judgment that defendants have engaged in an unlawful restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1);

B.      A judgment that Gulfstream, either independently or pursuant to a conspiracy with FSI, has unlawfully interfered with CAE's business relationships with third parties, including customers as well as suppliers of data, parts, and equipment;

C.      An award to CAE of compensatory damages sustained by CAE;

D.      A judgment against defendants, jointly and severally, by the Court in treble the amount of the damages award, in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15, and punitive damages, attorneys' fees, costs, and interest as allowable by law;

E.      A permanent injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining defendants from further violations of the antitrust laws and from practices that facilitate those violations;

F.      A permanent injunction under state law enjoining defendants' from further unlawful interference with CAE's business relationships with third parties, including customers as well as suppliers of data, parts, and equipment; and

G.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

CAE demands a trial by jury of all issues so triable by right to a jury.

                                        MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                                        */s/ Thomas C. Grimm*
                                        Jack B. Blumenfeld (#1014)
                                        Thomas C. Grimm (#1098)
                                        Stephen J. Kraftschik (#5623)
                                        1201 N. Market Street
                                        P.O. Box 1347
                                        Wilmington, DE  19899-1347
                                        (302) 658-9200
                                        jblumenfeld@mnat.com
                                        tgrimm@mnat.com
                                        skraftschik@mnat.com

                                        *Attorneys for Plaintiff CAE Inc.*

OF COUNSEL:

Kelsey I. Nix
JONES DAY
222 East 41st Street
New York, NY 10017-6702
(212) 326-3939

Brian K. Grube
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
(216) 586-3939

October 13, 2015
9535955