**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

CAE INC.,                                        :
                                                 :
          Plaintiff,                             :
                                                 :
     v.                                          :          C.A. No. 15-924-LPS
                                                 :
GULFSTREAM AEROSPACE                             :
CORPORATION and FLIGHTSAFETY                     :
INTERNATIONAL, INC.,                             :
                                                 :
          Defendants.                            :

Jack B. Blumenfeld, Thomas C. Grimm, Stephen J. Kraftschik, MORRIS, NICHOLS, ARSHT &
TUNNELL LLP, Wilmington, DE

Kelsey I. Nix, JONES DAY, New York, NY

Michelle K. Fischer, Brian K. Grube, JONES DAY, Cleveland, OH

Rebecca v. MacPherson, JONES DAY, Washington, D.C.

          Attorneys for Plaintiff.

Philip A. Rovner, Jonathan A. Choa, POTTER ANDERSON & CORROON LLP, Wilmington,
DE

Ronald L. Olson, Stuart N. Senator, Gregory M. Sergi, MUNGER, TOLLES & OLSON LLP,
Los Angeles, CA

          Attorneys for Defendant Flightsafety International, Inc.

Richard K. Hermann, MORRIS JAMES LLP, Wilmington, DE

Richard F. Ziegler, Brian J. Fischer, Thomas A. Bousnakis, Jenna E. Ross, JENNER & BLOCK
LLP, New York, NY

Benjamin J. Bradford, JENNER & BLOCK LLP, Chicago, IL

          Attorneys for Defendant Gulfstream Aerospace Corporation.

## MEMORANDUM OPINION

August 26, 2016
Wilmington, Delaware

**STARK, U.S. District Judge:**

## I.   INTRODUCTION

Plaintiff CAE Inc. ("Plaintiff") filed suit against Gulfstream Aerospace Corporation ("Gulfstream") and Flightsafety International, Inc. ("FSI," with Gulfstream, "Defendants") on October 13, 2015.  (D.I. 1)  On January 7, 2016, Plaintiff filed an amended complaint, alleging conspiracy in restraint of trade (in violation of § 1 of the Sherman Act), tortious interference with CAE's prospective business relations, and civil conspiracy.  (D.I. 4 ("Complaint"))  On February 29, 2016, FSI and Gulfstream each filed a motion to dismiss the Complaint for failure to state a claim.  (D.I. 12, 15)  On August 2, 2016, the Court heard oral argument on the motions.  (D.I. 29 ("Tr."))  For the reasons that follow, the Court will grant Defendants' motions.

## II.   BACKGROUND[1]

CAE is a Canadian corporation and is one of the world's leading suppliers of civil and military flight simulators.  (D.I. 4 ¶ 17)  CAE has provided simulators and training services for almost every modern airliner and for many business jets and helicopters.  (*Id.* ¶¶ 17-20)

FSI is a New York corporation that competes with CAE.  (*Id.* ¶ 21)  Like CAE, FSI designs and manufactures flight simulators and offers training services for many types of aircraft. (*Id.*)  CAE and FSI are the leading developers and providers of flight simulators and training services in the world.  (*Id.* ¶ 38)  Together, CAE and FSI provide 90% of all business flight simulators and 90% of the training services for those simulators.  (*Id.*)

---

[1]This recitation is based, as it must be at this stage, on taking as true all well-pleaded factual allegations in the complaint.

1

Gulfstream is a Delaware corporation that manufactures and sells aircraft. (*Id.* ¶ 23) Gulfstream is "one of the roughly half-dozen [manufacturers] in the world that design[s] and manufacture[s] the overwhelming majority of all business aircraft." (*Id.* ¶ 25) Gulfstream does not design or manufacture flight simulators, nor does it offer training services for those who purchase its planes. (*Id.*) Gulfstream's headquarters is located in Savannah, Georgia. (*Id.* ¶ 23)

In order to produce a flight simulator, one must have access to, "among other things, a complete set of flight test data reporting the aircraft's performance [during all operations and under all conditions within the flight envelope]; software and hardware components that mimic the instrumentation and operations of the aircraft; and physical components to model the cockpit." (*Id.* ¶ 31) Collectively, the set of hardware, software, and data needed to build a flight simulator are referred to as "data, parts, & equipment" (DP&E). (*Id.* ¶ 4) Because each flight simulator relies on specialized DP&E, simulators designed for one model of aircraft "generally cannot be used to train pilots for another model of aircraft." (*See id.* ¶¶ 32-34)

When a new airplane model is announced, companies – usually just CAE and FSI – typically bid for the opportunity to be the manufacturer's "authorized" training provider. (*Id.* ¶ 44) The company that is selected as the authorized provider works with the manufacturer to develop the simulator that will accompany the plane at the time of its launch. (*Id.* ¶¶ 42-43) Companies that are not selected as the authorized training provider can obtain the necessary DP&E at a later time from the original manufacturer or from a third party. (*Id.* ¶ 44) "[T]he path to developing flight simulators and [training] programs without data or support from [a manufacturer] . . . is substantially more difficult, time-consuming, and expensive." (*Id.* ¶ 48)

2

The claims in this case relate to flight simulators for the Gulfstream G650, Gulfstream's largest, fastest, and most expensive business jet. (*Id.* ¶ 26)  The G650 was announced on March 13, 2008. (*Id.*)  On October 21, 2009, FSI announced that it had been selected as the authorized training provider for the G650. (*Id.* ¶ 50)  In late 2011, CAE attempted to license DP&E for G650 from Gulfstream. (*Id.* ¶ 54)  Gulfstream refused to provide the DP&E. (*Id.*)  A few years later, on April 23, 2013, CAE renewed its inquiry regarding a license to the DP&E for the G650. (*Id.* ¶ 57)  On June 21, 2013, Gulfstream indicated that it had an agreement with FSI that prohibited Gulfstream from supplying DP&E or any other material support to anyone other than FSI for use in a G650 flight simulator. (*Id.* ¶ 58)  Gulfstream also indicated that it would "do what it had to do" to "actively discourage" CAE from building a G650 flight simulator, including blocking sales from third-party suppliers. (*Id.*)

Despite these statements, CAE attempted to obtain some of the required DP&E from Honeywell International, Inc. (*Id.* ¶ 60)  CAE had previously worked with Honeywell to obtain DP&E for Gulfstream's GIV, GV, G450, and G550 airplane models. (*Id.* ¶ 61)  From 2011 through 2014, Honeywell provided CAE with up-to-date lists of DP&E in its possession that pertained to the G650 airplane. (*Id.* ¶ 63)  In early 2014, Honeywell also provided CAE with price quotes relating to the G650 DP&E. (*Id.*)  Further, between March and December of 2014, Honeywell signed agreements allowing CAE to use its data and software in CAE's G650 flight simulator. (*Id.* ¶ 64)  CAE used this data to produce its first flight simulator for the G650. (*Id.* ¶ 65)

In late 2014, CAE issued a press release indicating that it would deploy its flight simulator in early 2016. (*Id.* ¶ 66)  Shortly thereafter, Gulfstream contacted CAE in order to

3

dissuade it from deploying its G650 simulator. (*Id.* ¶ 66-67)  In January 2015, Gulfstream

obtained "a full and complete list, by part number and other detailed identification data, of all

items provided to CAE . . . related to a G650 simulator." (*Id.* ¶ 71)  A few weeks later, on March

3, 2015, Honeywell cancelled all of CAE's pending purchase orders related to the G650 and

indicated that it would not accept any additional purchase orders. (*Id.* ¶ 73)  Honeywell then

entered into a new agreement with Gulfstream that required Honeywell to obtain Gulfstream's

consent before selling or licensing any of Honeywell's DP&E for use in a G650 simulator. (*Id.*

¶ 75)  Thereafter, Gulfstream has uniformly withheld consent. (*Id.* ¶ 76)

 CAE alleges that it cannot complete its second G650 flight simulator without

Honeywell's DP&E.  According to Plaintiff, Defendants intend to delay CAE from developing

its G650 simulators so that FSI can charge higher prices for G650 training services. (*See id.* ¶¶ 5,

87-88 (explaining that CAE's exclusion from the market has allowed FSI to increase the cost of

training services by 20-30%))  Plaintiff further alleges that FSI will split its additional profits

with Gulfstream. (*Id.* ¶ 5)

## III. LEGAL STANDARDS

 Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires

the Court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372

F.3d 218, 223 (3d Cir. 2004).  "The issue is not whether a plaintiff will ultimately prevail but

whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat*

*Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted).

Thus, the Court may grant such a motion to dismiss only if, after "accepting all well-pleaded

allegations in the complaint as true, and viewing them in the light most favorable to plaintiff,

plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks omitted).

However, "[t]o survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted). When evaluating a complaint, the Court may consider any documents or exhibits attached to or associated with the complaint. *See* Fed. R. Civ. P. 10(c); *see also Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

The Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

## IV.   DISCUSSION

### A.   Sherman Act Antitrust Claim

Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "every contract . . . or conspiracy, in restraint of trade or commerce." In order to state a claim under § 1 of the Sherman Act, a plaintiff must allege "(1) an agreement; (2) imposing an unreasonable restraint of trade within a relevant product market; and (3) resulting in antitrust injury." *TruePosition, Inc. v. LM Ericsson Telephone Co.*, 2012 WL 3584626, at *3 (E.D. Pa. Aug. 21, 2012); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010).

Count 1 of the Complaint alleges that Gulfstream and FSI violated § 1 of the Sherman Act. In their motions to dismiss, Gulfstream and FSI argue that the agreement between them did not result in antitrust injury. The Court agrees. While the Complaint adequately alleges the first two elements of a § 1 violation, it fails to adequately allege that the agreement resulted in an antitrust injury.

#### 1.   Agreement

It is undisputed that Plaintiff has adequately alleged an agreement among Defendants. That is, CAE alleges that Gulfstream and FSI agreed that Gulfstream would provide DP&E for its G650 only to FSI. (*See* D.I. 4 ¶¶ 58) It is further alleged that Gulfstream later entered into an agreement with Honeywell that requires Honeywell to obtain Gulfstream's consent before selling or licensing any of Honeywell's DP&E for use in a G650 simulator. (*Id.* ¶ 75) Plaintiff has satisfied the pleading standards for the first element of its Sherman Act § 1 claim.

6

## 2.    Unreasonable Restraint of Trade Within a Relevant Market

In order to determine whether Defendants' actions imposed an unreasonable restraint of trade in a relevant market, the Court must first identify the relevant market. *See Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) ("Before proceeding further we think it helpful to define the relevant market . . . ."). Plaintiff alleges that the relevant market is the market for G650 flight simulators and training services. (D.I. 4 ¶ 82)[2] By contrast, FSI argues that the relevant market is the market for flight training services generally. (*See* D.I. 13 at 16-17; D.I. 22 at 8) For purposes of the motion, the Court will adopt Plaintiff's characterization of the relevant market.

When considering whether two products are part of the same "relevant market" in the context of an antitrust analysis, courts consider product interchangeability, industry recognition, product characteristics, production facilities, customer bases, price independence, sensitivity to price change, and specialized vendors. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) ("Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak owner's perspective is composed of only those companies that service Kodak machines."); *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *GN Netcom, Inc. v. Plantronics, Inc.*, 967 F. Supp. 2d 1082, 1087 (D. Del. 2013); *Pepsico, Inc. v. Coca-Cola Co.*, 1998 WL 547088, at *8 (S.D.N.Y. Aug. 27, 1998).

---

[2]The Complaint indicates that the relevant geographic market is the United States. (D.I. 4 ¶ 83) Defendants do not appear to dispute this.

Based on these considerations, the Court concludes that Plaintiff has adequately alleged

there is a distinct market for G650 training services. *See Todd v. Exxon Corp.*, 275 F.3d 191, 200

(2d Cir. 2001) ("To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must

bear a rational relation to the methodology courts prescribe to define a market for antitrust

purposes – analysis of the interchangeability of use or the cross-elasticity of demand") (internal

quotation marks omitted).  Specifically, Plaintiff alleges that different models of flight simulators

are not interchangeable, have different customer bases, and respond to different market forces.

According to the Complaint, G650 pilots require specialized training that can only be obtained

with a G650 flight simulator.  (*See* D.I. 4 ¶¶ 31-34 (explaining that G650 simulator is only

product that can simulate G650's specialized equipment and unique flight behavior and that FAA

regulations require pilots to train on model-specific simulators))  Thus, a pilot cannot simply

swap G650 training services with services for another model; to train to operate a G650, a pilot

must use a G650 flight simulator.[3]  Different models of flight simulators also have different

product characteristics and different customer bases – all of which makes plausible the allegation

that the relevant market is as Plaintiff's propose. *See Brown Shoe*, 370 U.S. at 325 (indicating

---

[3]A customer would elect to switch flight simulator models if the customer elected to
switch airplane models.  However, given that training services account for "less than one
percent" of the cost of an aircraft (*see* D.I. 4 ¶ 92), it is unlikely that a customer's dissatisfaction
with training services would cause the customer to switch to a different airplane model.  Indeed,
the Complaint indicates that, when deciding which airplane model to purchase, business aircraft
buyers primarily consider "capital costs (price of airframe), as well as the size and range of
aircraft, its compliance with regulatory standards, and the availability of financing." (*Id.*)  This
means that unfair pricing and other anticompetitive behavior with respect to flight simulators and
training services would likely not impact one's decision to purchase a particular airplane model.
Put differently, this means that prices for different types of training services are independent and
that demand for any particular kind of training service is generally not sensitive to price changes.
These factors support the Court's conclusion that Plaintiff has adequately alleged that there is a
separate market for different types of flight training services. *See Brown Shoe*, 370 U.S. at 325.

8

that different product characteristics and distinct customer bases supports finding of separate markets).

In opposing Plaintiff's proposed market, FSI argues that antitrust law rejects the idea of a single-product market. However, in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. at 482 (1992), the Supreme Court recognized that "prior cases support the proposition that in some instances one brand of product can constitute a separate market." *Id.* (citing several cases that recognized single-product market). Accordingly, again, the Court concludes that the relevant market for antitrust purposes is the market for G650 flight simulators and training services.

Having identified the relevant market, the Court will now consider whether Defendants' agreement imposes an unreasonable restraint on competition in that market – that is, whether Defendants' agreement unreasonably restrains the market for G650 flight simulators and training services. "At the pleading stage, a plaintiff may satisfy the unreasonable-restraint element by alleging that the conspiracy produced anticompetitive effects in the relevant markets. Anticompetitive effects include increased prices, reduced output, and reduced quality." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010) (internal citations omitted); *see also E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2d Cir. 2006) (indicating that Complaint must allege "actual adverse effect on competition").[4]

---

[4]At later stages, Plaintiff would have to satisfy the "rule of reason test," which would include a requirement to prove that the adverse, anticompetitive effects of Defendants' conduct is not reasonably necessary to achieve whatever purportedly pro-competitive objective Defendants would articulate for it in their defense. *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1367 (3d Cir. 1996).

The Complaint adequately alleges that Defendants' agreement has had anticompetitive effects. Specifically, the Complaint alleges that, as a result of Defendants' agreement, FSI is charging 20-30% more for G650 training services than it does for training services for comparable models (D.I. 4 ¶ 88), there is at least one fewer G650 simulator on the market (*see id.* ¶¶ 77-78), and Plaintiff's exclusion from the market has precluded any meaningful competition for G650 training services until at least 2020 (*see id.* ¶¶ 5-10, 48-52, 76).

Therefore, Plaintiff has adequately alleged that Defendants' agreement imposes an unreasonable restraint of trade in the relevant market for G650 flight simulators and training services.[5]

### 3.    Antitrust Injury

Finally, the Court must consider whether Defendants' agreement caused an antitrust injury. In order to establish an antitrust injury, a plaintiff must show that: (1) it suffered an "injury of the type the antitrust laws were intended to prevent" and (2) the injury "flows from that which makes the defendant's acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 344, (1990) ("[An] injury, although causally related to an antitrust violation . . . will not qualify as an 'antitrust injury' unless it is attributable to . . . a competition-*reducing* aspect or effect of the defendant's behavior.").

---

[5]At the hearing, Defendants focused extensively on *Harrison Aire, Inc. v. Aerostar Intern., Inc.*, 423 F.3d 374 (3d Cir. 2005). (Tr. 6, 40-41) Because *Harrison* dealt primarily with the issue of tying – a claim that is not alleged in this case – it is not relevant to the present dispute.

The Complaint fails to adequately allege an antitrust injury.  Defendants' actions, as described in the Complaint, can best be understood in two parts.  First, Defendants agreed that Gulfstream would work exclusively with FSI when developing training services for the G650.  (D.I. 4 ¶ 5)  Second, Defendants agreed to dissuade and/or prevent Honeywell from providing DP&E for the G650 to Plaintiff.  (*Id.* ¶ 6)  Neither agreement is impermissible or is alleged to have caused injury of the type the antitrust laws were intended to prevent.

First, Defendants' exclusivity agreement did not create an antitrust injury.  Exclusivity agreements are generally permissible and are "presumptively legal." *E&L Consulting*, 472 F.3d at 30; *see also Pac. Bell. Tel. Co. v. Linkline Commc'ns. Inc.*, 555 U.S. 438, 448 (2009) (explaining that entities are free to conduct business, and to refrain from conducting business, with whomever they wish).  This is especially true where the exclusive provider is chosen through a competitive process, as seems to be alleged to have occurred here. (*See* D.I. 4 ¶¶ 42, 50, 53 (explaining that plane manufacturers use competitive process to select training service partner, Gulfstream selected FSI as partner for G650 in 2008, and Plaintiff did not begin planning its G650 simulator until 2011))[6] *See also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) ("[C]ompetition to be an exclusive supplier may constitute 'a vital form of rivalry,' which the antitrust laws should encourage."); *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010) ("It is well established that competition among businesses to serve as an exclusive supplier should actually be ***encouraged***.").

---

[6]While the Complaint indicates that Gulfstream entered into a "no-bid, exclusive dealing agreement," it does not allege that FSI was chosen unfairly or through an uncompetitive or corrupt process.  Instead, the alleged facts suggest that FSI actively sought the G650 contract early in the process, while Plaintiff did not begin its exploration until after Defendants' exclusivity agreement was in place.

One reason why exclusive agreements between a supplier and a service-provider are generally permissible is that they tend to have no greater anticompetitive effect than a situation in which an entity – such as Gulfstream – elects to move the disputed services in-house. *See E&L Consulting*, 472 F.3d at 29. Here, for instance, Gulfstream's exclusive arrangement with FSI does not result in any greater anticompetitive effect than would be present if Gulfstream had elected to develop its ***own*** flight simulator and training services for the G650 – conduct that Plaintiff does not allege would be unlawful.

While exclusive agreements can potentially cause antitrust problems, *see, e.g., ZF Meritor*, 696 F.3d at 270, the agreement at issue here does not bear any of the hallmarks of impermissible exclusivity agreements. The agreement between Gulfstream and FSI does not prevent Plaintiff from independently developing a G650 flight simulator (*see* D.I. 4 ¶ 48-49 (explaining that without support, process of developing simulator, while difficult, is not impossible)); did not involve any acts of fraud or deception, *see Geneva Pharm. Tech. Corp.*, 386 F.3d at 507-08 (concluding that exclusivity agreement was problematic where defendants lied to plaintiff to prevent plaintiff from obtaining supply needed to compete)[7]; and resulted from what seems to have been a competitive process that was open to Plaintiff (*see* D.I. 4 ¶¶ 42, 50, 53) and other competitors.[8]

---

[7]While the Second Circuit generally recognizes the validity of exclusive agreements, it reached a different outcome in *Geneva* based in large part on the presence of fraud and "predatory practices." *See E&L Consulting*, 472 F.3d at 30.

[8]Plaintiff's allegations of anticompetitive conduct are limited to the market for G650 training services. There is no allegation that Plaintiff was unable to compete to provide flight simulators and training services for other aircraft.

Gulfstream's efforts to dissuade Honeywell from working with Plaintiff – including securing Honeywell's contractual obligation to obtain Gulfstream's consent before supplying DP&E on the G650 to any other entity, including CAE – are also permissible.  Based on the facts alleged in the Complaint, Honeywell had access to the G650 DP&E only because Honeywell worked with Gulfstream to develop the G650 aircraft.  (*See* D.I. 4 ¶ 60 (explaining that G650 incorporates Honeywell's "Primus Epic" integrated avionics system); *id.* ¶¶ 32-33, 60 (explaining that avionics are unique to each model of aircraft)[9]  Hence, even taking Plaintiff's allegations as true, Honeywell is an associate of Gulfstream rather than a disinterested or neutral third-party.  While efforts by Gulfstream to interfere with Plaintiff's relationship with Honeywell may have caused antitrust injury were Honeywell a neutral third party, they do not constitute antitrust injury on the allegations here because Gulfstream and Honeywell were working together to make the G650 a successful aircraft supported by necessary training services.  There is no plausible allegation of antitrust injury in Plaintiff's contentions that Gulfstream entered into agreements with its own business partner, Honeywell, to protect Gulfstream's own data and intellectual property.  *See Pac. Bell. Tel. Co.*, 555 U.S. at 448.

Because Plaintiff has failed to allege facts sufficient to show an antitrust injury, Plaintiff fails to allege the facts needed to sustain a claim under § 1 of the Sherman Act.  Accordingly, the Court will grant Defendants' motions to dismiss this count.

---

[9]In the briefing, Plaintiff argued that Honeywell's avionics system was "off-the-shelf." (D.I. 21 at 10)  This assertion is directly at odds with the allegation in the Complaint that avionics systems are unique to each aircraft.  (*See* D.I. 4 ¶¶ 32-33, 60)

## B.    Tortious Interference

In Count 2 of the Complaint, Plaintiff alleges that Gulfstream tortiously interfered with

Plaintiff's prospective business relations with suppliers, specifically Honeywell.  (D.I. 4 ¶¶ 107-

20)  Gulfstream argues that Plaintiff has failed to state a claim on which relief may be granted

because the Complaint does not allege that (1) Gulfstream was "a stranger to the business

relations at issue" between Plaintiff and Honeywell, and (2) Gulfstream "improperly, wrongfully,

and maliciously" interfered with its prospective business relations with Honeywell.  (D.I. 16 at 1)

### 1.    Choice of Law

As an initial matter, the parties disagree about which state's law governs the dispute.

Gulfstream contends that Georgia law applies, while Plaintiff argues that there is no conflict

between Georgia law and Delaware law.  The Court agrees with Gulfstream and will apply

Georgia law.

To determine which law applies, the Court employs Delaware's two part choice-of-law

test.  *See Chin v. Chrysler LLC*, 538 F.3d 272, 278 (3d Cir. 2008) (explaining that forum state's

choice-of-law rules determine which state's law applies).  First, the Court considers whether

there is an actual conflict of law between Georgia and Delaware.  *See Penn. Emp. Benefit Trust*

*Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 466 (D. Del. 2010).  If there is no conflict, the Court

need not continue.  *See id.*  Otherwise, the Court applies the law of the jurisdiction that has the

most significant relationship to the occurrence and to the parties.  *See id.*

Here, the parties effectively agree that the Court should apply Georgia law.  Defendants

expressly seek application of Georgia law.  While Plaintiff argues for application of Delaware

law, it also contends that there is no difference between Delaware law and Georgia law.

14

Accepting this proposition as true, it follows that the Court will reach the correct outcome on the motions by applying Georgia law.  For this reason – and also because Georgia has a more significant relationship to this case than does Delaware[10] – the Court will apply Georgia law.

### 2.    Elements of Tortious Interference

In order to state a claim for tortious interference with prospective business relations under Georgia law, Plaintiff must allege: (1) improper action or wrongful conduct by the defendant without privilege, (2) malice, (3) that the defendant caused a party to discontinue or fail to enter into an anticipated business relationship, and (4) causation.  *See Fortson v. Brown*, 690 S.E.2d 239, 241 (Ga. Ct. App. 2010).  Gulfstream argues that the Complaint fails to adequately allege that Gulfstream acted without privilege, that Gulfstream engaged in "wrongful conduct," and that Gulfstream acted with malice.  The Court addresses these contentions below.

### 3.    Acting Without Privilege (Stranger Doctrine)

As part of its tortious interference claim, Plaintiff must allege that Gulfstream acted without privilege.  In order for a defendant to "act without privilege," the defendant must be a "stranger to the contract" with which it allegedly interferes.  *Id.*  As the United States District Court for the Northern District of Georgia has explained:

> Under Georgia law, a defendant is not a stranger as a matter
> of law when 1) the defendant is an essential party to the
> purported injured relations; 2) the allegedly injured
> relations are inextricably a part of or dependent upon the
> defendant's contractual or business relations; 3) the

---

[10]If there *were* a conflict between Georgia law and Delaware law, the Court would still apply Georgia law.  Where, as here, the claimed injury is a plaintiff's loss of customers, the principal location of the defendant's conduct is given the greatest weight in the choice of law analysis.  *See* Restatement (Second) of Conflict of Laws § 145(2) cmt. f.  Here, that would be Georgia, which is the location of Gulfstream's headquarters.

> defendant would benefit economically from the alleged
> injured relations; or 4) both the defendant and the plaintiff
> are parties to a comprehensive interwoven set of contracts
> or relations.

*Ford v. 1280 W. Condominium Ass'n, Inc.*, 2014 WL 4311275, at *9 (N.D. Ga. Sept. 2, 2014).

The Complaint fails to adequately allege that Gulfstream was a stranger to Plaintiff's

relationship with Honeywell.  As explained above, the facts alleged in the Complaint, taken as

true, demonstrate that Gulfstream and Honeywell collaborated to produce the avionics of the

G650.  If Gulfstream had not collaborated with Honeywell on the development of the G650, then

Honeywell would not have had access to the G650 DP&E and would not have had anything to

license to Plaintiff.  This means that the relationship between ***Plaintiff*** and Honeywell was

dependent upon ***Gulfstream's*** relationship with Honeywell.  Thus, Gulfstream, Plaintiff, and

Honeywell were all "parties to an interwoven set of contracts or relations."  *Ford*, 2014 WL

4311275, at *9; *see also Taylor v. Calvary Baptist Temple*, 630 S.E.2d 604, 606 (Ga. Ct. App.

2006) (finding that school was not stranger to contract between teacher and student because

school had facilitated teacher's test-prep course); *LaSonde v. Chase Mortg. Co.*, 577 S.E.2d 822,

824 (Ga. Ct. App. 2003) ("Chase Mortgage was not a stranger to the sales contract . . . [because]

Chase . . . held the note and security deed to the property at issue.").  Gulfstream, then, is not a

stranger to Plaintiff's relationship with Honeywell.

This conclusion is supported by Georgia cases stating that "[w]here the defendant has 'a

bona fide economic interest in the contract or relationship with one of the parties to the contract,'

he is not a stranger to the contract and acts with privilege with regard to that contract."  *Stefano*

*Arts v. Sui*, 690 S.E.2d 197, 203 (Ga. 2010); *see also Kirkland v. Tamplin*, 645 S.E.2d 653, 656

(Ga. Ct. App. 2007) (same); *Disaster Servs. Inc. v. ERC P'ship*, 492 S.E.2d 526, 529 (Ga. Ct. App. 1997) (same). Because Gulfstream has a bona fide relationship with Honeywell and a bona fide economic interest in the DP&E sold by Honeywell, Gulfstream is not a stranger to the contract between Plaintiff and Honeywell. Instead, Gulfstream acted in a manner it was privileged to do. Accordingly, Plaintiff has failed to state a claim under Georgia law for tortious interference and Count 2 must be dismissed.

### 3.   Wrongful Conduct and Malice

Given the inadequacy of Plaintiff's pleading as already described above in connection with the stranger doctrine, it is unnecessary for the Court to assess the other purported deficiencies Gulfstream identifies in seeking to dismiss Count 2 of the Complaint.

### C.   Civil Conspiracy

Finally, in Count 3 of the Complaint, Plaintiff alleges that Gulfstream and FSI were part of a civil conspiracy. Under Georgia law, a conspiracy "is a combination between two or more persons . . . to do some act which is a tort. . . . The gist of the action . . . is not the conspiracy alleged, but the tort committed against the plaintiff and the resulting damage." *Savannah College of Art & Design, Inc. v. School of Visual Arts of Savannah Inc.*, 464 S.E.2d 896 (Ga. Ct. App. 1995). Here, because Plaintiff has failed to state a claim for any underlying cause of action – the Court will be dismissing Plaintiff's antitrust and tortious interference claims – it follows that Plaintiff has failed to state a claim for conspiracy. (*See* Tr. 50 ("The conspiracy rises and falls with the tort claim because of the object of the tort claim . . . .")) Accordingly, the Court will grant Defendants' motion to dismiss Count 3

## V.    CONCLUSION

For the reasons stated above, the Court will grant Defendants' motions to dismiss for failure to state a claim.  At the hearing, Plaintiff requested leave to amend any deficiency in the Complaint.  (*See* Tr. 53)  This request is granted.  *See generally* Fed. R. Civ. Proc. 15(a) ("The court should freely give leave when justice so requires.").  An appropriate Order follows.